**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**PROPHARMA GROUP, LLC,**

        **Plaintiff,**

**v.**                                                    **Case No: 6:26-cv-1180-PGB-LHP**

**ANTHONY CRONE,**

        **Defendant.**

                        /

## <u>ORDER</u>

This cause comes before the Court on Plaintiff ProPharma Group, LLC's ("**Plaintiff**") Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 13 (the "**Motion**")), filed June 3, 2026. Upon consideration, the Court will grant Plaintiff's Motion in part, reserve ruling in part, and deny as to the remainder.

## I.     BACKGROUND

Through this action, Plaintiff, "one of the nation's leading pharma services companies," brings a series of claims against its former employee, Defendant Anthony Crone ("**Defendant**"), after he purportedly shared sensitive client information with his new employer—Plaintiff's direct competitor—in violation of his employment agreement with Plaintiff. (*See generally* Doc. 10).

### A.      Plaintiff's Business Operations

According to the operative Verified Amended Complaint (Doc. 10 (the "**Complaint**")), Plaintiff "helps pharmaceutical, biotechnology, and medical device companies navigate regulatory, clinical, safety, compliance and medical information to bring life-changing therapies to market." (*Id.* ¶ 1). Plaintiff avers that, for the past twenty-five years, it has invested substantial time and resources into developing its confidential data, business goodwill, and relationships with existing and prospective customers across the United States and abroad. (*Id.* ¶ 13). Moreover, one means by which it develops these assets is through the recruitment and retention of highly skilled sales professionals who cultivate and maintain relationships with customers and prospective customers. (*Id.* ¶ 14). According to Plaintiff, because certain of these professionals are exposed to its confidential information and trade secrets in the course of their work, when appropriate, it requires such employees to execute restrictive covenants and confidentiality agreements to protect this sensitive information. (*Id.* ¶ 18).

### B.      Defendant's Exposure to Plaintiff's Sensitive Information

Plaintiff avers that Defendant served as its Senior Vice President of Business Development from March 2024 to January 2026, and, through this role, was privy to Plaintiff's "most sensitive business-development information." (*Id.* ¶¶ 21, 25). For example, Defendant was exposed to internal information regarding Plaintiff's prospective and current customers, including their contact information; identities of their key decisionmakers; and internal notes concerning Plaintiff's prior

meetings with such customers, proposals thereto, expected account value, and the customers' needs. (*Id.* ¶¶ 24–26). In addition, Defendant was also exposed to Plaintiff's "non-public information concerning how [it] identifies, develops, nurtures, and converts business opportunities," and regarding its "go-to-market messaging, sales framing and methodology, competitive positioning," and "account-prioritization strategies." (*Id.* ¶ 26).

### C.   Defendant's Employment Agreement

Plaintiff alleges that, because Defendant's role would entail broad exposure to its sensitive information, Plaintiff's employment agreement with Defendant (Doc. 10-1 (the "**Agreement**")) contained provisions intended to safeguard such information, including certain restrictive covenants. To begin, the Agreement contained non-solicitation provisions regarding Plaintiff's clients and accounts (the "**Non-Solicitation Provisions**"), which included the following restrictions:

A.   The Employee agrees that any current clients with whom the Employee worked while employed by the Company or that were obtained for the Company by the Employee during the Employees employment with the Company ("Clients") are, and shall remain the sole and exclusive property of the Company at any time during the Employee's employment with the Company, and for a period of one (1) year thereafter . . . , Employee agrees that Employee will not, directly or indirectly induce, attempt to induce, or act in a manner that is reasonably likely to cause any Clients to cease doing business with or decrease the volume or amount of business done with the Company or to transfer their business, to any competitor of the Company. . . .

C.   The Employee agrees not to perform similar work or services that Employee provided to the Company on behalf of (1) any validation or related industry contractors which provide services to clients or other

contractors for whom the Employee has provided services under this Agreement, or (2) clients to which Company has marketed the services of the Employee within the last twelve (12) months of Employee's employment. This restriction is limited to a period of twelve (12) months following the last day of work on any project or twelve (12) months from the date of resume submission, whichever is later.

(*Id.* at pp. 5–6). The Non-Solicitation Provisions applied only to the geographical areas in which Defendant "provided services or had a material presence or influence within the last two (2) years" of his employment by Plaintiff. (*Id.* at p. 6). Moreover, the terms "client" and "other contractor" were defined as "any person or entity who or which used Company's services at any time during the two (2)-year period preceding termination of [the] Agreement." (*Id.*). Finally, through the Non-Solicitation Provisions, Defendant agreed that:

E.      The Company has a legitimate business interest in enforcement of the restrictions contained in this Agreement, including without limitation, the Company's need to protect the goodwill of the Company, its investment in training of the Employee, the client and vendor relationships of the Company, the stability of the Company's workforce, and the confidentiality of the Company's business information and other legitimate interests.

(*Id.*).

The Agreement also contains provisions regarding the non-disclosure of Plaintiff's trade secrets and its confidential information (the "**Non-Disclosure Provisions**"). (*Id.* at pp. 6–10). In relevant part, through the Non-Disclosure Provisions, Defendant acknowledged that his employment with Defendant would cause him to be exposed to Plaintiffs' trade secrets and other confidential

4

information. (*Id.* at pp. 6–7). The Non-Disclosure Provisions expressly defined "[t]rade [s]ecrets," to include Plaintiff's "files and records regarding customers [and] prospective customers . . . such as contact information; customer lists; prospective customer lists; [and] customer profiles . . . ." (*Id.* at p. 6). Moreover, it defined "confidential information" to include "lists and information about clients [and] customers." (*Id.* at p. 7).

By signing the Agreement, Defendant agreed that all of Plaintiff's trade secrets and confidential information would "forever be maintained in confidence" by Defendant and that such information would be used by Defendant "only to such extent as may be necessary in the ordinary course of performing services for [Plaintiff] under [the] Agreement." (*Id.*). Finally, Defendant agreed that, upon the termination of his employment with Plaintiff, or "at the request of [Plaintiff] at any time," Defendant would "immediately deliver" to Plaintiff its trade secrets and confidential information. (*Id.* at pp. 9–10). The Non-Disclosure Provisions further noted that Defendant "may be required to certify in writing that [he] has complied with these requirements." (*Id.* at p. 10).

Finally, the Agreement contains a section that predetermines remedies in the event of a breach of its terms (the "**Remedies Provision**"). (*Id.* at pp. 11–12). Through the Remedies Provision, Defendant "agree[d] that the harm that might result to [Plaintiff] of [Defendant's] non-compliance with this Agreement that endangers [Plaintiff]'s business relationships or prospects would be irreparable." (*Id.* at p. 11). Moreover, Defendant agreed that, should he breach the Non-

Solicitation Provisions or Non-Disclosure Provisions, Plaintiff "shall be entitled to an injunction restraining [Defendant] from further violations or potential violations." (*Id.*).

### D.   Defendant's Resignation and Events Occurring Thereafter

According to the Complaint, on January 12, 2026, Defendant notified Plaintiff that he was resigning four days later to pursue a new opportunity. (Doc. 10, ¶ 33). "Shortly thereafter," Defendant began working for NJS Associates ("**NJS**"). (*Id.* ¶ 34). NJS is a "biostatistics-led CRO[1] delivering regulatory-ready biometrics expertise across Phase I–III clinical development that partners with biotech and pharmaceutical sponsors on complex programs where statistical rigor and regulatory alignment are critical." (*Id.*). Plaintiff avers that NJS is its "direct competitor." (*Id.*).

Plaintiff alleges that, on May 12, 2026, approximately four months after Defendant resigned from his position with Plaintiff, Defendant inadvertently sent an email from his iCloud account to his former work email account maintained by Plaintiff. (*Id.* ¶ 36). This email contained "a photograph of a compilation of [Plaintiff's] customer information" from Plaintiff's customer relationship system ("**CRM**"). (*Id.* ¶¶ 3, 36). The timestamp on the photograph indicated that it was taken on January 6, 2026—six days before Defendant notified Plaintiff of his intent to resign. (*Id.* ¶¶ 33, 36). Moreover, the subject line contained the name of one of

---

[1]   The Court notes that the acronym "CRO" is neither defined in the passage of the Complaint containing this language nor at the hyperlink cited in support thereof. (Doc. 10, p. 34 & n.1).

Plaintiff's customers, while the email itself "contained several names, email addresses and phone numbers of the director and VP-level employees of said customer." (*Id.* ¶¶ 37–38). Critically, during this same timeframe, Plaintiff was "actively bidding on additional work for the same customer[.]" (*Id.* ¶ 38).

The next day, on May 13, 2026, Plaintiff's counsel sent Defendant a cease-and-desist letter. (*Id.* ¶ 40; Doc. 10-2). Therein, Plaintiff "reminded [Defendant] of his post-employment contractual obligations" and notified Defendant that he was in violation of the Agreement. (Doc. 10, ¶ 41). Moreover, Plaintiff asked that Defendant immediately come into compliance with the Agreement and to provide Plaintiff with relevant information and assurances by May 15, 2026. (*Id.* ¶ 42). On May 18, 2026, Defendant responded that he had received the cease-and-desist letter and represented he would reply "asap." (*Id.* ¶ 43). However, as of the date of the Motion's filing, Defendant had not done so. (*Id.*).

As a result of the foregoing, Plaintiff filed the instant lawsuit, wherein it raises four causes of action against Defendant. (*See generally* Doc 10). Specifically, Plaintiff asserts claims for: 1) breach of contract, 2) violations of the Trade Secrets Act, 3) violations of the Florida Uniform Trade Secrets Act, and 4) breach of the common law duty of loyalty under Florida Law.[2] (*Id.* ¶¶ 45–100).

Now, Plaintiff seeks a temporary restraining order requiring Defendant to:

---

[2]   Plaintiff alleges that the contract is governed by Florida law. (Doc. 10, ¶ 31 ("The Employment Agreement contains a choice of law provision, which provides the Employment Agreement will be governed and construed in accordance with the laws of the state of [Defendant]'s last assigned work location. Here, that is Florida." (citation omitted)); *see also* Doc. 10-1, p. 12).

(i)    refrain from retaining, copying, duplicating, using, or disclosing to any third party any trade secrets or confidential information of [Plaintiff's];

(ii)    abide by the terms of the Agreement, including the [Non-Disclosure] Provisions and the Non-Solicitation Provisions, as those terms are defined herein;

(iii)    immediately deliver to [Plaintiff] all documents, materials, and data (and copies thereof), in tangible, electronic, or intangible form, relating to the business of [Plaintiff], or confirm the destruction of the same; and

(iv)    make available for inspection and imaging any computers, tablets, smartphones, external storage devices, or personal data devices on which [Defendant] accessed and/or retained [Plaintiff]'s confidential information or trade secrets as well as any and all cloud-based file management accounts (including Gmail, iCloud, and Dropbox), email accounts, or other devices or accounts on which [Plaintiff]'s confidential information could reside.

(Doc. 13, p. 2). Plaintiff also seeks a preliminary injunction with the identical requirements to the requested temporary restraining order. (*Id.*). In the alternative, Plaintiff seeks an order to show cause as to why the Court should not issue such a preliminary injunction. (*Id.*). Finally, Plaintiff asks the Court to order Defendant to preserve any relevant evidence. (*Id.* at p. 3).

## II.    STANDARD OF REVIEW

In order to establish entitlement to a temporary restraining order or a preliminary injunction, Plaintiff must show (1) a substantial likelihood of success on the merits of the underlying case; (2) irreparable harm in the absence of injunctive relief; (3) that the harm suffered by Plaintiff in the absence of injunctive relief would exceed the harm suffered by Defendants if the injunctive relief issued;

8

and (4) that injunctive relief would not disserve the public interest. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002); *Miccosukee Tribe of Indians of Fla. v. United* States, 571 F. Supp. 2d 1280, 1283 (S.D. Fla. 2008).

## III. DISCUSSION

### A. Substantial Likelihood of Success on the Merits

In order to "obtain temporary injunctive relief, [a plaintiff] must show a substantial likelihood of success on at least one claim." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). Here, the Court determines that Plaintiff is likely to succeed on its breach of contract claim. Under Florida law, a breach of contract claim requires the following elements: 1) a valid contract existed; 2) a valid contract was breached; and 3) the breach resulted in damages. *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. 3d DCA 2017).[3]

There is a substantial likelihood that a valid contract exists between Plaintiff and Defendant. Specifically, a restrictive covenant is valid when an employer demonstrates "1) the existence of one or more legitimate business interests justifying the restrictive covenant and (2) that the contractually specified restraint is reasonably necessary to protect the established interests of the employer." *N. Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1228 (M.D. Fla. 2002) (citations omitted). Here, Plaintiff has a legitimate business interest in maintaining the

---

[3]   The Court notes that Plaintiff's counsel purports to quote from this case. (Doc. 13, p. 12). However, the quotation never appears in the case. The Court reminds Plaintiff's counsel that it has a duty of candor to the Court and must ensure the accuracy of its citations.

9

confidentiality of its customer list and the goodwill it has earned over its years of operation. *See Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004) (explaining that "legitimate business interests include: trade secrets, valuable confidential business information, substantial relationships with specific prospective or existing customers, customer goodwill, and extraordinary or specialized training" (citing FLA. STAT. § 542.335(1)(b))). Moreover, the restrictive covenant is necessary for the protection of the subject confidential information. Importantly, Defendant is employed by a direct competitor of Plaintiff, which of course has every incentive to utilize this information at Plaintiff's expense. Specifically, regarding the bidding process, a detailed understanding of the Plaintiff's client list could provide Defendant an unfair advantage in the course of competitive bidding. Accordingly, a valid restrictive covenant exists.[4]

---

[4]   The Court notes that the Non-Disclosure Provisions fail to include an appropriate time limitation, instead requiring Defendant to agree Plaintiff's trade secrets and confidential information will "forever be maintained in confidence." (Doc. 10-1, p. 7). The absence of any time limitation renders this restrictive covenant presumptively unreasonable. *See* FLA. STAT. § 542.335(1)(d). However, Plaintiff notes that the Court is empowered to enforce the Non-Disclosure Provisions by imposing an appropriate time restriction. (Doc. 13, p. 15); *see* FLA. STAT. § 542.335(1)(c) (noting that "[i]f a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests"); *4UOrtho, LLC v. Practice Partners, Inc.*, 18 So. 3d 41, 43–44 (Fla. 4th DCA 2009) (remanding an injunction order enforcing a restrictive covenant to the trial court and directing that it "apply a time restriction" thereto). For the purposes of the instant temporary restraining order, the Court imposes a one-year time restriction on the Non-Disclosure Provisions following the termination of Defendant's employment by Plaintiff. *See* FLA. STAT. § 542.335(1)(d) ("[A] a court shall presume reasonable in time any restraint 6 months or less in duration and shall presume unreasonable in time any restraint more than 2 years in duration."); *Envt'l Servs., Inc. v. Carter*, 9 So.3d 1258, 1263 (Fla. 5th DCA 2009) (finding a restrictive covenant that applied for a one year period of time to be enforceable after noting this period is "presumptively not unreasonable" under FLA. STAT. § 542.335(1)(d)). However, the Court may revise this time constraint at the motion for preliminary injunction stage.

Next, Plaintiff has demonstrated a substantial likelihood that Defendant has breached the contract. Specifically, Defendant's emailing of Plaintiff's customer information, while Defendant's employer "was actively bidding on the same work," clearly demonstrates a substantial likelihood that a breach occurred. (Doc. 13, p. 15). Thus, Plaintiff has demonstrated a substantial likelihood of success on the merits of its breach of contract claim. Further, such a breach is not only substantially likely to cause damages, but indeed, is substantially likely to cause *irreparable* harm. *See* discussion *infra* Section III.B. Accordingly, Plaintiff has established a substantial likelihood of success on the merits of its breach of contract claim.

### B.    Irreparable Harm

Finding that Plaintiff has demonstrated a likelihood of success on the merits as to its breach of contract claim, the Court turns to the element of irreparable harm. "A showing of irreparable injury is the '*sine qua non* of injunctive relief.'" *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). The showing of irreparable injury "must be neither remote nor speculative, but actual and imminent." *Id.* While Florida Statute § 542.335(1)(j) provides that "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant," there has been some question about whether this statute applies in federal court. *See, e.g., Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1292 (11th Cir. 2022) (noting

that the application of § 542.335(1)(j) in federal court "raises a knotty choice-of-law question"); *Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1278 (M.D. Fla. 2020) (acknowledging that the application of the presumption of irreparable harm under § 542.335(1)(j) "has been questioned"). In any event, the Court finds Plaintiff adequately demonstrates irreparable harm.

Plaintiff asserts that Defendant's conduct risks inflicting irreparable harm because Defendant refuses to return Plaintiff's customer information from the CRM and to provide assurances that he is not using such information. (Doc. 13, p. 20). As such, Plaintiff provides clear evidence that Defendant is using Plaintiff's trade secrets and other confidential information to solicit Plaintiff's customers. (*Id.* at pp. 20–21). "The law is clear: '[T]he loss of customers and goodwill is an irreparable injury.'" *JetSmarter Inc. v. Benson*, No. 17-62541-CIV, 2018 WL 2709864, at *7 (S.D. Fla. Apr. 6, 2018), *report and recommendation adopted*, No. 17-62541-CIV, 2018 WL 2688774 (S.D. Fla. Apr. 26, 2018).

Here, in his role as Senior Vice President of Business Development, Defendant was privy to Plaintiff's "most sensitive business-development information." (Doc. 10, ¶¶ 21, 25). Specifically, Defendant was exposed to internal information concerning Plaintiff's prospective and current clients, including their contact information; identities of their key decisionmakers; and internal notes concerning Plaintiff's prior meetings with such customers, proposals thereto, expected account value, and the customers' needs. (*Id.* ¶¶ 24–26). Defendant's behavior in sending such sensitive business information from is iCloud email

12

account to his former work email suggests that he was planning to use such information in his new position with Plaintiff's competitor, NJS. (*Id.* ¶¶ 3, 34, 36); *see also All Leisure Holidays Ltd. v. Novello*, No. 12-62328-CIV, 2012 WL 5932364, at *5 (S.D. Fla. Nov. 27, 2012) (finding that a defendant's email containing the plaintiff's "proprietary and confidential information and data" constituted irreparable harm because the defendants "likely have, or [were] about to, misappropriate [the plaintiff's] trade secrets."). This supports a finding of irreparable harm because Plaintiff "risks losing customers, goodwill, and market competitiveness to its direct competitor, [NJS]". *Freedom Med.*, 469 F. Supp. 3d at 1278.

Furthermore, in the Remedies Provision of the Agreement, Defendant "agree[d] that the harm that might result to [Plaintiff] of [Defendant's] non-compliance with this Agreement that endangers [Plaintiff]'s business relationships or prospects would be *irreparable*."[5] (Doc. 10-1, p. 11 (emphasis added)). Several courts in this Circuit have found this is sufficient in showing irreparable harm for a breach of contract claim. *See, e.g.*, *JetSmarter Inc.*, 2018 WL 2709864, at *7 (citing to the terms of a contract which stated that "any breach of the terms. . . would result in irreparable injury and damage" as additional evidence of irreparable harm). Accordingly, the Court finds that Plaintiff has established irreparable harm.

---

[5]   Indeed, Defendant agreed that, should he breach the Non-Solicitation Provisions or Non-Disclosure Provisions, Plaintiff "shall be entitled to an *injunction* restraining [Defendant] from further violations or potential violations." (Doc. 10-1, p. 11 (emphasis added)).

## C.    Balancing of Harms

Next, the balance of harms element clearly weighs in favor of granting a temporary restraining order. Here, Plaintiff established that it will likely suffer an irreparable injury in Defendant using Plaintiff's "trade secrets and other confidential information" to solicit Plaintiff's customers. (Doc. 13, pp. 20–21). Consequently, Plaintiff stands to lose its confidential information and customers to its competitor, NJS. *See Freedom Med.*, 469 F. Supp. 3d at 1279. By contrast, if the Motion is granted, Defendant is only required "to do that which he willingly promised" to do in the Agreement. *Id.* Specifically, by signing the Agreement, Defendant agreed that all of Plaintiff's trade secrets and confidential information would "be maintained in confidence" by Defendant. (Doc. 10-1, p. 7). Additionally, Defendant agreed that, upon the termination of his employment with Plaintiff, or "at the request of [Plaintiff] at any time," Defendant would "immediately deliver" to Plaintiff its trade secrets and confidential information. (*Id.* at pp. 9–10). As Plaintiff contends, any alleged harm suffered by Defendant is self-inflicted by his non-compliance with the Agreement. (Doc. 13, pp. 22–23).

As such, the balance of harms clearly weighs in Plaintiff's favor.[6] *See 7-Eleven, Inc. v. Kapoor Bros. Inc.*, 977 F. Supp. 2d 1211, 1227 (M.D. Fla. 2013) ("In

---

[6]    Further, several courts in this Circuit have found that a plaintiff's ownership of the trade secrets and confidential information at stake to be sufficient in tipping the balance of harms in the plaintiff's favor. *See, e.g.*, *Truepenny People LLC v. Cota*, No. 3:16CV424/MCR/CJK, 2016 WL 9308534, at *2 (N.D. Fla. Oct. 18, 2016) ("Moreover, because Plaintiff owns the trade secrets and confidential and proprietary information is at stake, the harm to Plaintiff outweighs any threat of potential harm to the Defendant from the injunction."); *Q. Grady Minor & Assocs., LLC v. Blueshore Eng'g, LLC*, No. 2:24-CV-634-JLB-KCD, 2024 WL 3361270, at *5 (M.D. Fla. July 10, 2024) (same); *Naples Cheer Acad. Inc. v. Naples Element*

this light, weighing Defendants' essentially self-inflicted injuries against the immeasurable losses to [p]laintiff's goodwill, the Court finds that the balance of harms 'weighs decisively in favor of granting the requested injunctive relief.'" (quoting *Dunkin' Donuts Franchised Rests., LLC v. KEV Enters., Inc.*, 634 F. Supp. 2d 1324, 1336 (M.D. Fla. 2009)).

**D.    The Public Interest**

Finally, as to the public interest element, "the public interest is served by protecting trade secrets and enforcing confidentiality agreements." *Freedom Med., Inc.*, 469 F. Supp. at 1279; *accord VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1363 (S.D. Fla. 2012) (finding that an injunction "would affirmatively serve the public interest by protecting businesses from employees who misappropriate their trade secrets."). Furthermore, "enforcement of valid restrictive covenant[s]" serves the public interest because they "encourage[] parties to adhere to contractual obligations" and are "necessary to encourage business expansion and growth." *See 7-Eleven, Inc.*, 977 F. Supp. 2d at 1230; *Off. Depot, Inc. v. Babb*, No. 20-CV-80407, 2020 WL 1306984, at *4 (S.D. Fla. Mar. 19, 2020). Accordingly, a temporary restraining order in the instant action is in the public interest because it would enforce the validly entered Agreement and would

---

*All Stars, LLC*, No. 2:25-CV-296-JLB-KCD, 2025 WL 2852250, at *5 (M.D. Fla. Apr. 24, 2025) (same).

protect Plaintiff's trade secret and confidential information from any further misuse by Defendant.

### E.   Security

Pursuant to Federal Rule of Civil Procedure 65(c), a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court and the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)) (alterations accepted). Under the circumstances and considering the terms of the temporary restraining order imposed by the Court herein, the Court finds that no security should be required of Plaintiff because the Court is simply enforcing an agreement Defendant has signed. *See id.*

### F.   Issuance of a Temporary Restraining Order Without Notice

Under Federal Rule of Civil Procedure 65(b)(1), a "court may only issue a temporary restraining order without written or oral notice to the adverse party or its attorney" if two requirements are met:

> (A)   specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

16

> (B)   the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

FED. R. CIV. P. 65(b)(1)(A)–(B). For all of the reasons explained *infra*, the Court finds that the requirements of Rule 65(b)(1) are met. *See* FED. R. CIV. P. 65(b)(1)(A)–(B). Defendant's conduct, as described above, demonstrates that Plaintiff will suffer the loss of customers and goodwill absent the Court's intervention, which constitutes an irreparable injury. *See* discussion *infra* Section III.B. For this reason, the Court issues the instant Order before Defendant can be heard in opposition. *See* FED. R. CIV. P. 65(b)(1)(A), (b)(2). Finally, Plaintiff certifies in writing that, "[o]n June 3, 2026, the undersigned sent [Defendant] via email, a copy of the Amended Verified Complaint and this Motion." (Doc. 13, p. 25). Plaintiff further notes that, since it provided Defendant with notice of his need to comply with the Agreement, Defendant has remained in breach thereof, and "none of the requested assurances have been made" by Defendant. (*Id.*). Accordingly, the Court finds that the requirements of Rule 65(b)(1) have been met. *See* FED. R. CIV. P. 65(b)(1)(A)–(B).

### G.   Preservation Order

Plaintiff also requests that the Court issue an order directing Defendant to preserve any relevant evidence in his possession. (Doc. 13, p. 2). "Federal courts have the implied or inherent power to issue preservation orders as part of their general authority 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Robinson v. Gielow*, No. 3:14CV223/LAC/EMT,

17

2015 WL 4459880, at *3 (N.D. Fla. July 21, 2015) (citations omitted). In deciding whether to issue such an order, "courts have conducted a balancing test, considering the following three factors":

> 1) the level of concern the court has for the continuing existence and maintenance of the integrity of the evidence in question in the absence of an order directing preservation of the evidence; 2) any irreparable harm likely to result to the party seeking the preservation of evidence absent an order directing preservation; and 3) the capability of an individual, entity, or party to maintain the evidence sought to be preserved, not only as to the evidence's original form, condition or contents, but also the physical, spatial and financial burdens created by ordering evidence preservation.

*Angrigon v. KLI, Inc.*, No. 08-81218-CIV-COHN/SELTZER, 2009 WL 10666946, at *1 (S.D. Fla. Apr. 13, 2009) (collecting cases).

The Court finds that a preservation order is warranted here. First, the Court is concerned about the integrity of electronically stored information concerning Defendant's handling of Plaintiff's sensitive information, which is susceptible to deletion or alteration absent the Court's intervention. *See id.* Further, Plaintiff will suffer irreparable harm if that evidence is lost because it bears directly on whether Defendant disclosed or used Plaintiff's confidential information or trade secrets. *See id.* Finally, Defendant can preserve the information with minimal burden by maintaining data already within his possession, custody, and control. *See id.* Thus, Plaintiff's request for a preservation order will be granted.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.   Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 13) is **GRANTED IN PART**, **DENIED IN PART**, and the Court **RESERVES RULING** in part.

2.   Plaintiff's request for a temporary restraining order is **GRANTED** to the extent that:

   a.   Defendant is **TEMPORARILY ENJOINED** from retaining, copying, duplicating, using, or disclosing to any third party any of Plaintiff's trade secrets or confidential information;

   b.   Defendant **SHALL** abide by the terms of the Agreement (Doc. 10-1), including the Non-Solicitation Provisions and Non-Disclosure Provisions, as those terms are defined herein; and

   c.   Defendant **SHALL** immediately deliver to Plaintiff all documents, materials, and data (and copies thereof), in tangible, electronic, or intangible form, relating to Plaintiff's business, or confirm the destruction[7] of same.[8]

---

[7]   The Court cautions Defendant not to destroy any such materials to the extent they constitute evidence relevant to the instant suit, as this would violate the preservation requirement imposed by this Order.

[8]   While Plaintiff also asks the Court to enter a temporary restraining order that requires Defendant to make certain of Plaintiff's devices "available for inspection and imaging" by Plaintiff, the Court finds this would be more appropriately requested through the discovery process. (Doc. 13, p. 2). Moreover, the Court finds this approach particularly appropriate because the preservation relief granted herein addresses Plaintiff's concern that relevant evidence be preserved.

3. This temporary restraining order shall remain in effect until **June 25, 2026**.

4. The Court **RESERVES RULING** on Plaintiff's request for a preliminary injunction. (*See* Doc. 13). A hearing to determine whether to convert this temporary restraining order into a preliminary injunction is set for **June 25, 2026**, at **10:00 a.m.**[9] in Courtroom 4B of the George C. Young U.S. Courthouse, 401 W. Central Boulevard, Orlando, Florida, 32801.

   a. Plaintiff is **DIRECTED** to immediately serve on Defendant the materials required by Local Rule 6.01(c). Moreover, Plaintiff is further **DIRECTED** to file proof of service immediately after effecting proper service.

   b. On or before **five (5) business days** after Defendant receives service of the materials required by Local Rule 6.01(c), Defendant may file a response to the Motion and include any opposing declarations or affidavits. *See* Local Rules 3.01(c); 6.02.

   c. **Two (2) business days** after Defendant responds, Plaintiff may file a reply to Defendant's response. Plaintiff's reply shall be directed only to Defendant's response; shall not include any

---

[9] If Defendant requires additional time to prepare for this hearing, he may move the Court for a continuance.

new issues, rebuttal affidavits, or other evidence in support; and shall not exceed five (5) pages.

d.  On or before **June 22, 2026**, the parties are **DIRECTED** to advise the Court if they seek to present testimony at the hearing and, if so, file their witness lists and provide a summary of the expected testimony.

5.  Defendant is further **ORDERED** to immediately take steps to preserve evidence relevant to this dispute, including but not limited to, relevant electronic evidence.

6.  Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 13) is **DENIED** in all other respects.

**DONE AND ORDERED** in Orlando, Florida on June 15, 2026.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties